**CLIFFORD HART, LESTER HARRIS and FLORIDA INDUSTRIAL COMMISSION, v. STATE LIVE STOCK SANITARY BOARD and BITUMINOUS CASUALTY CORPORATION, a corporation.**

13 So. (2nd) 11                                January Term, 1943
April 16, 1943                                       Division B
Rehearing Denied May 4, 1943

*Lester A. Harris,* for appellants.

*Fishback & Smith* and *W. R. Smith,* for appellees.

BROWN, J.:

This is an appeal from a judgment of the circuit court setting aside the finding and order of the Florida Industrial Commission on an appeal from an order entered by a deputy commissioner on July 21, 1942. The order of the Florida Industrial Commission was entered on September 18, 1942 and was set aside by an order of the circuit judge on December 22, 1942, in which order the award of the deputy commissioner was affirmed and adopted as an order of the circuit court.

The claimant, a young man, frequently referred to in the testimony as a boy, suffered a gun-shot wound in his right thigh on January 26, 1942, while engaged in his employment

by the State Live Stock Sanitary Board as a deer hunter in the Everglades section of Collier County in the State tick-eradication campaign. His average weekly wage was $23.08 and compensation was paid him under the workmen's compensation law for total disability at the rate of $13.85 per week up to April 3, 1942, at which time the insurance carrier ceased making any payments. Hart filed a claim for additional compensation and his doctor's bills, hospital bills, etc. Hearings were had before the deputy commissioner of the Florida Industrial Commission on May 22nd and July 3rd, 1942. The deputy commissioner found that from April 3rd to July 3rd the claimant had a "temporary partial disability" and that his earning capacity had been reduced to such an extent as to entitle him to compensation of $6.00 a week from April 3rd to July 3rd, but that claimant did not show any right to compensation after July 3rd, 1942. Claimant filed a petition for review by the full Commission on July 23, 1942, and the full Commisison by an order dated September 21, 1942, found that claimant had suffered an injury in the course of his employment which resulted in "temporary total disability" for an indeterminable future period, and ordered the appellees to pay compensation at the rate of $13.85 per week in a sufficient amount to bring such compensation current from April 3, 1942, to date, and thereafter to continue such payments until the termination of the total disability of the claimant, provided that such payments should not continue for a longer period than 350 weeks from the date of the injury.

The different degrees of disability and the compensation to be paid therefor are set forth in Section 15 of the Workmen's Compensation Law, now appearing as Section 440.15 of the Florida Statutes, 1941. Paragraph 2 of that Section that for "temporary total disability" the employee is entitled to 60 per cent of the average wage which he had been earning, for a period not to exceed 350 weeks. And paragraph (4) of the same section provides that in case of "temporary partial disability resulting in decrease of earning capacity" the compensation shall likewise be 60 per cent of the difference between the injured employee's average weekly wages

before the injury and his wage-earning capacity after the injury in the same or some other employment, to be paid during the continuance of such disability, but shall not be paid for a period exceeding five years.

We think the testimony in this case clearly establishes temporary total disabiilty of the claimant to engage in the work of deer hunting in the Everglades from the time of his injury, at least up to the time of the last hearing before the deputy commissioner on July 3, 1942, and that he was entitled to $13.85 per week, at least up to that tme. The accidental shot through the thigh resulted in injury to the sciatic nerve, which caused what is commonly known as "drop foot," a partial paralysis of the muscles of the lower leg or upper ankle and especially of those on the upper part of the foot, which made it impossible for the claimant to raise his right foot although he could stand on both feet and could walk with a flapping of the right foot. He could also drive a truck for a limited time, but he could not lift his foot from the brake. Instead he had to slide it off. He also suffered with numbness in a portion of his leg and a considerable amount of pain when he walked or stood for any considerable period of time. This was the condition that obtained at the time of the hearing on July 3rd when several physicians who had examined the claimant, testified. They differed in their opinions as to the degree of the disability, and as to the time it would take for him to recover, if ever, the full use of his foot.

Witness Bateman, an old deer hunter who had started the deer hunting work down the Everglades for the State Live Stock Sanitary Board, and also had worked for the Bureau of Animal Industry, and under whom Clifford Hart had worked, testified that although young Hart had been one of the best deer hunters he had ever had, that if witness was still boss down there he would not hire him in his present condition; that he could not last an hour. He said that that country down there was full of lime rock holes and water, that a man could not hunt deer down there by walking; that he had to do a lot of running; that he, the witness, stayed down there twenty six months and "the Everglades ran me

out." He also said that "in rough woods like that it takes a man with two good legs and a good back and a weak mind to stay down there." Claimant Hart gave similar testimony, except that he made no reference to a weak mind. He also said that it was frequently necessary to wade through water of depths varying from ankle deep to neck deep for hours at a time.

Taking the testimony of the doctors as a whole, we think it is made quite plain that this young man at the time of the hearing, was utterly incapacitated for the kind of work he had been doing; that he might possibly at some time in the future, say some six months to a year sufficiently recover the use of his foot to resume active deer hunting or some other kind of outdoor work; that a moderate amount of exercise and walking might help him toward recovery, but he was not fitted for steady out-door or manual work at that time and it was more or less of a guess as to when, if ever, he would again become able to do hard or regular out-door manual labor. The testimony of the physicians, while differing in some respects, shows that he was physically able to do such indoor work as that of a stenographer or book-keeper, or some other work which would not overstrain his crippled foot, but as this boy had had only a sixth grade education, and as the evidence does not disclose that he had ever had any experience with indoor clerical work, he was not at the time of the hearing shown to have been capacitated for that kind of work, though the possibility of finding some kind of suitable employment, that he could do without injury and without indefinitely delaying his recovery, was not completely negatived.

The deputy commissioner found that from April 3rd to July 3rd the claimant had "a temporary partial disability" and was entitled, by reason of the reduction in his earning capacity to $6.00 per week during that period. The deputy commisisoner further found that claimant was able to return to work on July 3rd but he was making no effort to work and therefore that the claimant was not entitled to any compensation after July 3rd. We think the commissioner was in error in his conclusions from the evidence in this

case. We did not have an opportunity of hearing the witnesses testify, but there is no attack made on the sincerity or credibility of their testimony, and as we read this testimony this claimant was not able to return to manual out-door work on July 3rd, and it would have been absolutely futile for him to have made an effort to return to such work at that time. Furthermore, it would probably have resulted in either preventing entirely or greatly postponing the recovery of the full use of his foot. In this connection we call attention to the fact that the deputy commissioner states that: "It is shown that he has some pain from extended walking but it is not shown that the pain is in fact disabling." No finding was made by the commissioner as to what claimant's condition might be after a good faith effort has been made by him to work, as the testimony of the physicians indicated that the effect of work would be uncertain.

One of the physicians, Dr. McGugan, testified that he had treated several hundred gun-shot wounded men in the first world war and that "it is common knowledge with all surgeons that a man with 'drop foot' should not be allowed to put too much strain on those muscles, because, in place of helping, it would be apt to increase the disability." He also testified that if claimant returned to his former work "it would overstrain these weakened muscles and his foot would grow worse and also he is liable to stumble and have another accident. If he were in my care I would put him on a regular course of stimulation to bring these muscles back to life, and if that did not bring about the result desired, then I would expose the nerve."

Dr. McGugan concluded that claimant had a 50 per cent loss of the use of his foot, as far as forest work was concerned.

In addition to the foot injury and its resulting consequences, this young man had lost the sight of one eye before the accident. He stated that he did not know of any other kind of work that he could do at the time, but he admitted that he had made no effort to find any other kind of work. One of the physicians testified that he needed further treatment, and it is quite reasonable to assume that at that time

the boy had not yet reached the point where he should go back to manual work, even of a milder type.

On the whole we think the evidence in this case shows that the finding of the deputy commissioner should have been that this was a case of temporary total disability up to July 3rd, 1943, as was held by the full Commission, but that after July 3rd, 1942, this was a case of temporary partial disability as defined by sub-section 4 of Section 440.15, Florida Statutes 1941, which reads as follows:

"(4) Temporary Partial Disability: In case of temporary partial disability resulting in decrease of earning capacity the compensation shall be sixty per centum of the difference between the injured employee's average weekly wages before the injury and his wage-earning capacity after the injury in the same or other employment, *to be paid during the continuance of such disability,* but shall not be paid for a period exceeding five years." (Italics supplied.)

So the order of the full Commission should have been affirmed in part, and reversed in part.

Appellant has also moved this Court to fix an attorney's fee for his attorney in representing him on this appeal. We find that such a fee in the sum of $75.00 is a reasonable one and is hereby allowed, to be paid by appellees.

It follows from what has been hereinabove said that the judgment of the circuit court must be and hereby is reversed and the cause remanded for the entry of an appropriate judgment consistent with the foregoing opinion.

BUFORD, C. J., THOMAS and SEBRING, JJ., concur.